LOS ANGELES GAS & ELECTRIC CO. v. CITY OF LOS ANGELES et al.

(District Court, S. D. California, S. D. May 11, 1917.)

1. ELECTRICITY ⬤⇒9(3)—RIGHTS IN STREETS—MUNICIPAL REGULATION.

Conceding that a public necessity could exist justifying a city in requiring the removal and relocation of an electric lighting company's poles and instrumentalities in order that it might install a municipal lighting system, no such necessity exists, where there are several companies engaged in furnishing electricity in the city and to its inhabitants, as it will be assumed that the city can compel such companies to furnish sufficient light for its inhabitants at a fair and reasonable remuneration.

[Ed. Note.—For other cases, see Electricity, Cent. Dig. § 4.]

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. EVIDENCE ☞22(1)—JUDICIAL NOTICE.**

The court will take judicial notice that there are several companies engaged in generating and furnishing electrical energy in the city of Los Angeles and to its inhabitants.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 26.]

**3. MUNICIPAL CORPORATIONS ☞589—POLICE POWER—NATURE.**

Whatever a city does under the guise of the police power, it does in its governmental capacity; the police power being the power to govern.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1308, 1319.]

**4. ELECTRICITY ☞1½—FURNISHING BY CITY—GOVERNMENTAL OR CORPORATE CAPACITY.**

Whatever a city does in engaging in the furnishing and delivering of electrical energy to itself and its inhabitants is done in its proprietary or quasi private capacity.

**5. ELECTRICITY ☞9(3)—RIGHTS IN STREETS—MUNICIPAL REGULATION.**

Where an electric lighting company under a franchise is maintaining its poles and instrumentalities in the streets of a city, the city cannot exercise its governmental power to compel the removal and relocation of such poles and instrumentalities in order that it may, in its proprietary or quasi private capacity, install a municipal lighting system, since, when acting within the domain of its proprietary capacity, it may not draw power to itself through an assumption of public and governmental functions.

[Ed. Note.—For other cases, see Electricity, Cent. Dig. § 4.]

**6. ELECTRICITY ☞9(3)—RIGHTS IN STREETS—MUNICIPAL REGULATION.**

While an electric lighting company, maintaining its poles and instrumentalities in the streets of a city under a franchise, acquires no right under such franchise to maintain them at any particular place on the public streets, it acquires a right of priority, preventing the city from compelling the removal or relocation of such instrumentalities in order that a competitor of later origin may take their place.

[Ed. Note.—For other cases, see Electricity, Cent. Dig. § 4.]

**7. CONSTITUTIONAL LAW ☞134—EMINENT DOMAIN ☞2(1)—TAKING PROPERTY WITHOUT COMPENSATION—IMPAIRMENT OF CONTRACTS.**

For a city to require an electric lighting company occupying the streets with its poles and instrumentalities to relocate them at its own expense, in order that the city may install a municipal lighting system, constitutes an appropriation of the company's property without compensation and an impairment of the contractual right accorded to it by its acquisition and acceptance of a franchise to perform the public service in which it is engaged.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 344; Eminent Domain, Cent. Dig. §§ 3–8.]

In Equity. Suit by the Los Angeles Gas & Electric Company against the City of Los Angeles and others. Decree for complainant.

Paul Overton, Herbert J. Goudge, and H. C. Beach, all of Los Angeles, Cal., for complainant.

Albert Lee Stephens, W. B. Mathews, William B. Himrod, and Lewis E. Whitehead, all of Los Angeles, Cal., for defendants.

BLEDSOE, District Judge. For a number of years, under a franchise obtained pursuant to the provisions of the Constitution of California as it existed prior to 1911 (see Russell v. Sebastian, 233 U. S.

195, 34 Sup. Ct. 517, 58 L. Ed. 912, Ann. Cas. 1914C, 1282), complainant, a public service corporation, has been operating and maintaining its poles, wires, conduits, and other instrumentalities in the streets and public places of the city of Los Angeles for the purpose of supplying and furnishing electrical energy to said city and to the inhabitants thereof for, illuminating and other purposes.

Complainant is now serving electrical energy to approximately 40,-000 consumers in such city, and the value of its property dedicated and engaged in such public service aggregates several millions of dollars. Its poles, wires, and other instrumentalities have been installed in and upon the streets and other public places in said city under the direction of the board of public works thereof, the department of the city government having charge of streets and thoroughfares.

The defendant city of Los Angeles, being authorized so to do under the laws of the state, is now, and for some months past has been, engaged in the erection, construction, and operation of a distributing system for the distribution and sale of electrical energy to be used for the purposes of lighting the streets and public places in the city of Los Angeles, and supplying to the inhabitants and others in said city electrical energy for illuminating and other purposes, for a remuneration. On the 7th day of March of this year the defendant city through its duly constituted legislative body enacted an ordinance, the validity of which constitutes the only real question in this case. The purpose and far-reaching effect of the ordinance can be stated in no better way than by a recital of its title and a reference to its material terms. They are appended in the margin.[1]

[1] "An ordinance providing for the removal or relocation of poles and other properties located in public streets and other public places of the city of Los Angeles, when necessary in order that the municipal electrical street lighting system may be constructed, operated and maintained therein."

The body of the ordinance then provides that:

"Whereas, the public peace, health and safety demand the construction and establishment by the city of Los Angeles of an electrical system, whereby the public streets and other public places of said city may be lighted, and, to that end, it is necessary that pole and wire lines, street lamp fixtures, and other incidental appliances, should be installed in the public streets and public places of said city as speedily as may be practicable; and, whereas, various persons, firms and corporations are maintaining in the public streets and other public places of said city, poles, anchors, cross-arms, wires, street lamps and other fixtures, appliances and structures, and it is necessary, in order that sufficient space may be secured for said municipal electrical system in said public streets and public places, and that the work of constructing and establishing the same may be carried on, to provide for the removal or relocation of certain of said poles and other properties so maintained by said persons and corporations. Therefore: The mayor and council of the city of Los Angeles do ordain as follows:

"Section 1. That whenever it shall appear to the board of public works of said city that the removal or relocation of any pole, anchor, cross arm, wire, street lamp, or any other fixtures, appliance or structure, owned or controlled by any person, firm or corporation, and located in, upon, over or under any public street or public place of said city, is necessary in order that the municipal electrical street lighting system of said city, or any part thereof, may be erected, operated or maintained in such public street or public place, then said board shall give notice in writing to the person, firm or corporation owning or controlling said pole or other property, located as aforesaid, to

Pursuant to the terms of the ordinance, after appropriate action by the board of public works, plaintiff was notified to move certain of its wires to new locations and remove entirely certain other fixtures. This action was thereupon commenced, asking that the city officials be enjoined from enforcing said order, and that said ordinance be declared null and void. A temporary restraining order was issued, and the case is before the court on final hearing. Persuasive testimony was introduced, showing that a compliance with the ordinance at all places throughout the city where changes would be necessary would entail an expenditure on plaintiff of over $50,000.

It is apparent from even a casual reading of the enactment, that, if it be valid, "in order that the municipal electrical street lighting system may be constructed, operated and maintained," the city purposes, in so far as and whenever the same may be necessary to allow of the proper installation of the municipal system, to require complainant and other privately owned companies holding franchises and maintaining instrumentalities for the transmission and delivery of electrical energy in the city of Los Angeles to remove to such places as may be ordered by the city all apparatus and instrumentalities that may interfere with the proper installation of the municipal system. In other words, the city of Los Angeles having decided, because of reasons which were, no doubt, sufficiently cogent and persuasive, that it would engage in the business of furnishing electrical energy to itself and to its inhabitants, in order that it may proceed in accordance with its own

remove or relocate the same; that such notice shall state the number and location of the poles, anchors, cross-arms, wires, street lamps, or other fixtures, appliances or structures, to be removed or relocated, and, when relocation of any such poles, anchors, cross-arms, wires, street lamps, or other fixtures, appliances or structures, is required in such notice, then such notice shall designate the location in, upon, over or under any such public street or other public place to which the same shall be removed; and it shall be the duty of such person, firm or corporation to begin, within five (5) days after the giving of such notice, the work of removing or relocating the poles, anchors, cross-arms, wires, street lamps, or other fixtures, appliances or structures designated in such notice, and to prosecute such work diligently to completion.

"Sec. 2. It shall be unlawful for any person, firm or corporation owning or controlling any pole, anchor, cross-arm, wire, street lamp, or any other fixtures, appliances, or structure located in, upon, over or under any public street or other public place in the city of Los Angeles, to fail or refuse to begin the work of removing or relocating such pole, anchor, cross-arm, wire, street lamp, fixture, appliance or structure within five (5) days after receiving notice in writing from the board of public works of said city so to do, as provided in section 2 of this ordinance.

"Sec. 3. It shall be unlawful for any person, firm or corporation owning or controlling any pole, anchor, cross-arm, wire, street lamp, or any other fixture, appliance or structure located in, upon, over or under any public street or other public place in the city of Los Angeles, to neglect or refuse, after five (5) days' notice in writing from the board of public works of said city to said person, firm or corporation, as provided in section 2 of this ordinance, to remove or relocate any such pole, anchor, cross-arm, wire, street lamp, fixture, appliance or structure to diligently prosecute such removing or relocating to completion.

"Sec. 4. That any person, firm or corporation violating any of the provisions of this ordinance shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be punishable by a fine of not more than five hundred

determined plans in the premises, has decreed by ordinance that privately owned companies engaged in the same business, and now and for some time lawfully occupying the public streets, may be required to remove or relocate, at their own expense, and subject to a penalty of fine and imprisonment for refusal, such instrumentalities situate upon the public ways of the city as seem to interfere with the proposed installation of its system. Or, to phrase it still differently, in order that its own municipal lighting system heretofore determined upon may be installed, the city has enacted that, in so far as the same may be necessary, other systems, already installed and belonging to private corporations, must be removed or relocated at the expense of the owners thereof.

[1] It is asserted by the city that the right to do this thing which, at first blush, would seem to be rather sweeping and autocratic, is justified by "public necessity" (New Orleans Gas Co. v. Drainage Commission, 197 U. S. 453, 25 Sup. Ct. 471, 49 L. Ed. 831), and the "police power." Conceding, for purposes of argument merely, that a public necessity could exist sufficient to entitle the city to assert such an authority over private property, it suffices, in my judgment, to state that no such necessity has been shown to exist in this controversy.

If it were true that privately owned utility companies were occupying the streets of the city of Los Angeles to the exclusion of any new entrant therein, and that they were either refusing or were unable ade-

dollars ($500) or by imprisonment in the city jail for a period of not more than six (6) months, or by both such fine and imprisonment.

"Each such person, firm or corporation shall be deemed guilty of a separate offense for every day during any portion of which any violation of any provision of this ordinance is committed, continued or permitted by such person, firm or corporation, and shall be punishable therefor as provided by this ordinance.

"Sec. 5. That said board of public works, or the board, commission or officer of said city having in charge the construction and establishment of said municipal electrical system, shall have power to move or relocate any pole, anchor, cross-arm, wire, street lamp, or any other fixture, appliance or structure, owned and controlled by any person, firm or corporation in a public street or public place in said city, where such person, firm or corporation shall fail, within five (5) days after receipt of notice, as aforesaid, to begin the work of removing or relocating the same, or shall fail to diligently prosecute such work to completion.

"Sec. 6. That said city is now engaged in the construction of an electrical system for lighting the public streets and other public places of said city; that said city has heretofore been compelled to depend on contracts with private utility corporations for furnishing lighting for such public streets and public places and some of said contracts have already expired and all of said contracts will have expired by July 1, 1917, and the completion of said municipal system is necessary in order that said city may be able to provide for lighting its public streets and other public places without interruption; that the removal and relocation of certain poles, anchors, cross-arms, wires, street lamps and other fixtures, appliances and structures, owned or controlled by various persons, firms or corporations and located in said public streets and other public places of said city, are immediately necessary in order that the city may complete and install its said electrical system; therefore, this ordinance is urgently required for the immediate preservation of the public peace, health and safety; and the city clerk shall certify to its passage by a unanimous vote, and cause the same to be published once in the Los Angeles Daily Journal and thereupon and thereafter it shall take effect and be in force."

quately to provide for the lighting of the city, it might be that such a situation would justify, under the police power of the city, the assertion of the authority contemplated in the ordinance under consideration.

[2] This court, however, because of its knowledge of local conditions, will take judicial notice, and in fact it is demonstrated by the very language of the ordinance itself, that there are at the present time several companies engaged in generating and furnishing electrical energy in the city and to its inhabitants. The suggestion is nowhere made, much less substantiated by evidence, that there is any such present or probable inadequacy in the matter of the supplying of such energy as to justify the finding, or the inference, that the city itself is compelled, on grounds of "public necessity," to go into the business of furnishing light to itself and its inhabitants. The very ordinance recites that:

> "Various persons, firms, and corporations are maintaining in the public streets and other public places of said city, poles, anchors, cross-arms, wires, street lamps, and other fixtures, appliances and structures, and it is necessary, in order that sufficient space may be secured for said municipal electrical system in said public streets and public places, and that the work of constructing and establishing the same may be carried on, to provide for the removal or relocation of certain of said poles and other properties so maintained by said persons and corporations."

This language of the ordinance, which no doubt was framed in view of existing conditions, tells its own story in illuminating fashion, and demonstrates that there is no real "public necessity" for the city engaging in the business of furnishing light. The only "necessity" existing is that, in order that the city system may be installed as planned, other systems now in place shall be moved. Indulging in the obvious inferences justified by the language of the ordinance, under the law and from the conditions easily observable, the court must assume, in the absence of evidence of a persuasive nature to the contrary, that with the regulatory powers of the law at hand (Price v. Riverside Co., 56 Cal. 431; Pinney & Boyle Co. v. L. A. Gas Corp., 168 Cal. 12, 15, 141 Pac. 620. L. R. A. 1915C, 282, Ann. Cas. 1915D, 471; Russell v. Sebastian, 233 U. S. 195, 208, 34 Sup. Ct. 517, 58 L. Ed. 912, Ann. Cas. 1914C, 1282; 26 Cyc. 377), the city could compel the companies operating within its confines to furnish sufficient light for its inhabitants at a fair and reasonable remuneration therefor.

In so construing the situation the court conceives that it is giving to the phrase "public necessity" the meaning usually accorded to it when dealing with the police power. I doubt not that the city has embarked upon the venture of furnishing and distributing electrical energy with perfect and commendable propriety. I doubt not that after careful and painstaking investigation it has been found that the city may engage in this undertaking with profit to itself and to its inhabitants. I am assuming that, ultimately and in due course, the public welfare and the public convenience and the public exchequer will be augmented by this indulgence in municipal activity. I am simply stating, however, what seems to me to be the obvious, that the motives which prompted this undertaking have been those of propriety and expediency

rather than those of necessity, as that term is defined and understood by those who have to do with the construing of the police power.

[3, 4] Whatever the city may do under the guise of the police power it must be remembered it does in its governmental capacity. The exercise of the police power has been most aptly and perhaps most comprehensively defined as "the power to govern" (License Cases, 5 How. 504, 582, 12 L. Ed. 256), the "most illimitable" of all powers of government (the Slaughterhouse Cases, 16 Wall. 36, 62, 21 L. Ed. 394), the "law of overruling necessity" (28 Cyc. 692). Whatever the city does, however, in the matter of actually engaging in the furnishing and delivering of electrical energy to itself and its inhabitants is done in its proprietary or quasi private capacity (Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 8, 10, 19 Sup. Ct. 77, 43 L. Ed. 341; South Pasadena v. Pasadena Land Co., 152 Cal. 579, 593, 93 Pac. 490; Safety Insulated Wire Co. v. Baltimore, 66 Fed. 140, 143, 13 C. C. A. 375), and the two must always be differentiated in any attempt to define and determine the rights of a city in such a controversy as the present.

[5] While operating in its private capacity, and considerations of necessity giving rise to an exertion of the police power being nonexistent, as adverted to hereinabove, the power of police is wanting, and may not be asserted in furtherance of that which is merely expedient. In other words, when acting clearly within the domain of its private and proprietary capacity, the city may not draw sustenance or power to itself through an assumption of public and governmental functions. As said by the Supreme Court of the United States in South Carolina v. United States, 199 U. S. 437, 463, 26 Sup. Ct. 110, 117, 50 L. Ed. 261, 4 Ann. Cas. 737, quoting from a Pennsylvania case where the question of the city supplying gas to its inhabitants was under consideration:

"Such contracts are not made by the municipal corporation, by virtue of its powers of local sovereignty, but in its capacity of a private corporation. The supply of gaslight is no more a duty of sovereignty than the supply of water. Both these objects may be accomplished through the agency of individuals or private corporations, and in very many instances they are accomplished by those means. If this power is granted to a borough or a city, it is a special private franchise, made as well for the private emolument and advantage of the city as for the public good. The whole investment is the private property of the city, as much so as the lands and houses belonging to it. *Blending the two powers in one grant does not destroy the clear and well-settled distinction*, and the process of separation is not rendered impossible by the confusion. In separating them, regard must be had to the object of the Legislature in conferring them. If granted for public purposes exclusively, they belong to the corporate body in its public, political, or municipal character. But if the grant was for purposes of private advantage and emolument, though the public may derive a common benefit therefrom, the corporation quoad hoc is to be regarded as a private company. It stands on the same footing as would any individual or body of persons, upon whom the like special franchises had been conferred." (Italics supplied.)

The doctrine therein asserted and the holding in that case seem to have met with approval by the Supreme Court of California, as intimated in Davoust v. Alameda, 149 Cal. 69, 72, 84 Pac. 760, 5 L. R. A. (N. S.) 536, 9 Ann. Cas. 847.

If the engaging of the city in the business of furnishing electrical energy to itself and its inhabitants is in all respects a purely private ven-

ture as thus indicated, and if it is to be accorded the same and no other consideration than any other private venture of the same character, it would seem indubitably clear that the city, acting in its governmental capacity, would have no authority to confer rights upon its own lighting system, based upon and growing out of a destruction and disregard of the rights of other systems engaged in the same business and standing in the same relation to the law. And this would seem to be true whether we accept the conclusion of the majority of the court, or the concurring opinion of Mr. Justice Shaw, in the California case just cited, 149 Cal. 69, 75, 84 Pac. 760, 5 L. R. A. (N. S.) 536, 9 Ann. Cas. 847. So understanding the law, it would hardly be contended, and if contended would hardly meet with judicial approval, that the city, in the exercise of its police power or otherwise, possesses authority to provide that one public utility company having a lawful franchise to serve the city, and serving it, can be compelled to move or relocate its properties in order that another company similarly engaged may be installed or be enabled to carry on its business.

[6] It is the law without question, based no less upon reason than upon judicial authority, that, upon a corporation like complainant securing a franchise to serve the public in the respect herein indicated, it acquires no right under such franchise to locate or maintain its poles or other instrumentalities *at any particular place* upon the public streets. In its occupancy of public places, it has a right to *do* a particular thing, but no right to *be* in a particular place. It is subject, of course, at all times, to such due and reasonable regulation as may be enjoined upon it by competent authority, having in view the rights of others who may have use for the streets and having also in view the necessities of the occasion and the demands of the public from time to time. New Orleans v. Drainage Commission, 197 U. S. 453, 25 Sup. Ct. 471, 49 L. Ed. 831. It may, under its franchise, occupy no more space upon the public street than is reasonably necessary for the performance of the high public duty and purpose incumbent upon it. Without doubt, the location of its wires and conduits may be limited either laterally or vertically, or even caused to be buried beneath the surface, as the same may reasonably be required under the demands of public necessity and public convenience. When, however, pursuant to the terms of its lawful franchise, it has established its poles and wires and other instrumentalities in the public streets, it may lawfully and properly object to being compelled to remove or relocate them in order that another company, a competitor of later origin and right coming in, may take their place and thereby be enabled to carry on its own intended business. In other words, in this as in many other relations, first in time is first in right, and superiority of right consequent upon being first in time may not be nullified by even necessary requirements of a competitor or other utility later in time and therefore inferior in right. Edison Electric Light & Power Co. v. Merchants' & Manufacturers' Co., 200 Pa. 209, 219, 49 Atl. 766, 86 Am. St. Rep. 712; Paris Electric Light Co. v. Southwestern Telegraph Co. (Tex. Civ. App.) 27 S. W. 902; Rutland Electric Light Co. v. Marble City Electric Light Co., 65 Vt. 377, 26 Atl. 635, 20 L. R. A. 821, 36 Am. St. Rep. 868. In 200 Pa.

209, 219, 49 Atl. 766, 767, 86 Am. St. Rep. 712, the Supreme Court of Pennsylvania said:

"As between two corporations exercising similar franchises upon the same streets, priority carries superiority of right. Equity will adjust the conflicting interests as far as possible and control both so that each company may exercise its own franchises as fully as is compatible with the necessary exercise of the other's. But, if limitation or interference of one or the other are unavoidable, the later must give way, and the fact that it is under contract with the city for work of a public nature does not alter its position, or give it any claim to preference."

By the same token, the fact that the later corporation is the city itself, instead of being "under contract with the city for work of a public nature," would create no rights superior to those of the earlier occupant of the field. This case was approved by the same court in Edison Electric Co. v. Citizens' Electric Co., 235 Pa. 492, 507, 84 Atl. 438. See, also, Bell Telephone Co. v. Belleville Electric Co., 12 Ont. Rep. (Queen's Bench Div.) 571; Western Union Tel. & Tel. Co. v. Los Angeles Electric Co. (C. C.) 76 Fed. 178.

If, on the grounds of necessity urged, the city could rightfully under the law assert the power to compel the removal and relocation of complainant's instrumentalities, in order that its own instrumentalities might be installed in accordance with its predetermined plans, it would seem to me to be equally true that, similar conditions of necessity respecting its ability to maintain the system existing, the city could lawfully enact that no resident of the municipality along the line of its lighting system should be furnished with electrical energy from any system save the municipal system. This would be a most effective way of furthering the interests and welfare of the city if the success of its municipal system is to be taken as an index of its welfare, but at the same time, obviously, it would be in complete and utter disregard of the rights of complainant and others situated like it. I cannot see, however, that such a course of action would present any substantially different legal problem from that now before the court.

[7] Of course it is to be assumed in this controversy that, in all its actions to be had and taken under and pursuant to this ordinance, if valid, the city will be actuated only by motives of necessity, in so far as they may be thought to exist, and that it will enforce as little inconvenience and expense upon complainant in the matter of the readjustment of its poles and wires as is compatible with the proper and satisfactory installation of the municipal system. Be that as it may, yet, in so far as the city intrenches upon the superior right acquired because of prior location by complainant, and in so far as it requires complainant to relocate its instrumentalities at its own expense, not as a matter of genuine "public necessity" and justified by considerations of public welfare under the police power, but merely in order that the instrumentalities of the city may be located in their place, its action is, in my judgment, arbitrary, unreasonable, and in violation of the superior right of location belonging to complainant, and is, in effect, an appropriation of plaintiff's property without compensation (Woodward v. Central Vermont Ry. Co., 180 Mass. 599, 62 N. E. 1051; concurring opinion of Mr. Justice Holmes, C., B. & Q. Ry. Co.

v. Drainage Commissioners, 200 U. S. 561, 595, 26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175), and is also an impairment of the contractual right accorded to complainant in virtue of its compliance with the constitutional provision hereinabove referred to and its acquisition and acceptance of the constitutional franchise enabling it to perform the public service in which it is now engaged (Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 17, 19 Sup. Ct. 77, 43 L. Ed. 341; Grand Trunk Ry. Co. v. South Bend, 227 U. S. 544, 553, 33 Sup. Ct. 303, 57 L. Ed. 633, 44 L. R. A. [N. S.] 405).

Defendant, in support of its asserted right to enact and enforce the ordinance in question, has cited to the court no case which seems to stand in any wise as a precedent to the action herein taken. The arguments advanced by counsel are not persuasive for the reasons adverted to hereinabove. The cases cited by counsel, however, which it is claimed do lend support to the contention of defendant, are C., B. & Q. Ry. Co. v. Illinois, 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175; New Orleans Gas Co. v. Drainage Commissioners, 197 U. S. 453, 25 Sup. Ct. 471, 49 L. Ed. 831; Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523, and many other cases of similar trend and nature. Obviously, however, as the merest reading of those cases will show, they announce no doctrine different from that accepted herein, to wit, that a public service corporation like the plaintiff, in the performance of its duty to the public under franchise or other similar contract, has no right to any particular location in or upon the public streets or highways, but that it is at all times subject to the police power of the state and subject to such general regulations as may arise from and spring out of the necessities of the public welfare and convenience. Neither of these cases, however, and none that have been cited or to which the attention of the court in its labors has been directed, may be said to go to the extent that a city or other sovereign functionary, having embarked upon a business venture, may assert its sovereign power merely for the purpose of enabling it successfully to install its own properties and in violation of superior rights of location belonging to a competitor because of priority of installation.

As indicated hereinabove, assuming the necessity, propriety, and expediency of such course to have been satisfactorily determined by those in authority, I am in entire harmony with a plan of municipal improvement such as has been projected in the city of Los Angeles and as is here under consideration. I am, however, also firmly of the belief that until the city, by purchase, appeal to eminent domain, or otherwise, has lawfully and properly and justly eliminated competition, it must meet its competitors as any other private agency would be compelled to meet them, and must stand with them in the same relation to the law, and let its success be measured by its ability satisfactorily to serve the public, rather than by its power through the exertion of public functions to occupy a position of supremacy in the field which it deliberately has chosen to invade.

A decree will be entered, declaring the ordinance void and enjoining its enforcement.